# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF NORTH CAROLINA
# DURHAM DIVISION

| | | |
|---|---|---|
| **SHARI MONTGOMERY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:26-cv-212** |
| **v.** | ) | |
| | ) | |
| **CITY OF DURHAM,** | ) | **JURY TRIAL DEMANDED** |
| **NORTH CAROLINA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff **Shari Montgomery**, by and through her undersigned attorneys, HKM Employment Attorneys, LLP, brings this civil action for relief and damages against Defendant **City of Durham**, **North Carolina**, based on the following factual allegations and causes of action:

## PRELIMINARY STATEMENT

1. Plaintiff Shari Montgomery ("Montgomery" or "Plaintiff") brings this action to correct discriminatory employment practices by Defendant City of Durham, North Carolina ("Defendant" or "Durham") under Title VII of the Civil

1

Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq*.,  ("Title VII"); and 42 U.S.C.A. §§ 1981 and 1983.

2.      Montgomery, who is Black, served 25 distinguished years in the Durham Police Department, ("PD") including a stint as Interim Chief of Police. She served as a Deputy Chief of Police from 2021 until her termination in April 2025.

3.      In 2024, the Durham PD became embroiled in an internal controversy involving allegations by Black officers that recently adopted changes to the promotion process favored white officers. Claims also emerged that a white Assistant Chief received an improper benefit from his financial ties to an entity training candidates for promotion, and that another Deputy Chief, who is white, failed to adequately monitor compliance with departmental protocols regarding the promotional process.

4.      Eventually, the two white senior officers associated with the scandal were punished for their missteps: the assistant chief  was permitted to resign while the Deputy Chief received verbal counseling. But somehow, Montgomery, who had no substantive involvement in the changes to the promotional metrics, was still swept into the debacle and eventually fired in the spring of 2025, the harshest sanction issued in connection with the inquiry.

5.       Montgomery then pursued an administrative appeal and presented evidence directly contradicting major elements of the claims against her. In the

2

summer of 2025, she was notified that her termination was about to be rescinded. But when she rejected a demand to waive her legal claims, the City reversed course. Montgomery's appeal has languished for approaching a year as her reputation and career have been devastated.

6. Montgomery files this lawsuit to challenge her unlawful treatment and seeks economic and compensatory damages under Title VII and §§ 1981,1983; as well as her attorneys' fees and costs of litigation.

## PARTIES

7. Montgomery is a citizen of the United States and a resident of the State of North Carolina and was employed by the Durham PD.

8. City of Durham is a municipal entity subject to suit sued under Title VII, as well as §§ 1981 and 1983.

## JURISDICTION

9. The Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1343(a) (4) and 28 U.S.C. §1331 (federal question).

## VENUE

10. Pursuant to 28 U.S.C. §1391(b)(1), the Middle District of North Carolina is the proper venue for the filing and prosecution of this action, in that the Defendant in this case has a principal place of business within the Middle District of

3

North Carolina and because the employment practices and other conduct alleged to be unlawful occurred in this District.

**Exhaustion of Administrative Remedies under Title VII**

11.     Montgomery filed a charge of discrimination against Durham with the Equal Employment Opportunity Commission ("EEOC") on April 16 2025, Ch. No. 433-2025-02375. *See* Attachment A.

12.     Montgomery received a notice of Right to Sue on December 8, 2025. *See* Attachment B. She timely files her Title VII claims within 90 days of her receipt of the notice.

**FACTUAL ALLEGATIONS**

13.     Shari Montgomery initially joined the Durham PD in 1999 and over the next 25 years rose to the upper ranks of the department, reaching the position of Deputy Chief in 2021 and serving a stint as Interim Chief from June 2021 to November 2021.

14.     In late 2021, Patrice Andrews was named Chief of the Durham Police Department.  She retained Montgomery as one of three Deputy Chiefs.

15.     In the spring of 2023, the Durham PD implemented several changes to the officer promotional process. The department continued its use of a testing tool that evaluated officers' knowledge of standard operating policies and

4

decisionmaking scenarios, but added an additional component in the form of a skills matrix.

16. The skills matrix assessed promotional candidates' participation in a variety of training curricula and assigned points for each offering. The overall score was added to a candidate's promotional portfolio as another qualitative factor for promotional panels to consider.

17. A number of Black and minority officers viewed the skills matrix as a flawed tool that rewarded officers for enrolling in extracurricular classes sponsored by local colleges and security firms without genuinely assessing aptitude. Criticism emerged that white officers were being quietly steered to enroll in training classes, which typically had limited slots of availability.

18. Other concerns emerged that Assistant Chief David Anthony, who is white, had a financial relationship with a consulting entity that sponsored courses included in the skills matrix. Anthony supervised the administrative services division that is responsible for the implementation of the promotional process.

19. As early as the late summer of 2023, rumors began to circulate that minority officers intended to file an internal complaint or administrative grievance over the injecting of the skills matrix into the promotional process. In early September, another Assistant Chief, Mark Clancy, provided Montgomery a copy of a letter of complaint that was being circulated by one officer.

5

20.     On September 6, 2023, Montgomery orally briefed Chief Andrews about the letter of complaint.

21.     Another year unfolded and at some point in the summer of 2024, the internal affairs office launched an investigation of whether Assistant Chief Anthony was deriving an improper financial benefit from a security firm offering skills courses for inclusion in the skills matrix and whether Anthony had misused his authority to champion the matrix for improper reasons.

22.     At some point, Deputy Chief Melissa Bishop, a white female, became a subject of the IA inquiry as well due to an allegation that she failed to obtain review of the matrix from Morris & McDaniel, a consulting entity that is contracted by the city of Durham to develop the promotional testing tool and to advise the city on best institutional practices or evaluating candidates for promotion. Bishop was also responsible for supervision of the administrative services division that oversees the promotion process.

23.     In October 2024, Montgomery was suddenly advised that she was being placed on an administrative leave and formally charged under departmental policy with questioning an officer about his participation in the internal investigation of Anthony. Montgomery was ordered to surrender her gun and badge and soon directed to report to the property division of the Durham PD to perform recordkeeping tasks.

6

24. In mid November, 2024, the investigation of Montgomery expanded and three additional charges were added: one inaccurately accused Montgomery of failing to advise Chief Andrews over a year earlier of the complaint about the skills matrix from a minority officer (when in fact she had done so); another cited Montgomery for removing disciplinary records from personnel files in her prior role as an Assistant Commander of the Professional Standards Division; and a third accused Montgomery of failing to take action when she received a report in 2023 that David Anthony had accessed the internal affairs database without authorization.

25. In late November 2024, Montgomery retained the law firm HKM Employment Attorneys, which on November 25, 2024 emailed a communication on her behalf to the City Attorney's Office outlining that Montgomery was prepared to take legal action against Durham and raised a variety of potential areas of exposure.

26. One allegation outlined was that Andrews had engaged in an ongoing retaliation campaign against Montgomery because of information about Andrews' professional history that Montgomery provided to the City Manager Wanda Page during the 2021 police chief selection process.

27. Montgomery, who was Interim Chief at the time, did not apply for permanent selection as Police Chief and had no formal role in the candidate evaluation process. But when questioned by Page, Montgomery disclosed that she was aware of persistent rumors that Andrews during a prior stint as a senior officer

7

with the Durham PD had engaged in inappropriate sexual relationships with subordinate officers, and had potentially put the city at risk for Title VII claims of harassment.

28. Montgomery's attorneys alleged in the November 25 correspondence that once assuming the Chief's position, Andrews realigned the command structure to remove several pivotal roles from Montgomery's responsibility, including oversight of the investigative services division, and had precluded Montgomery from involvement in a range of operational decisions in which she participated prior to Andrews' hiring. The letter attributed Andrews' actions to retaliation for Montgomery's reporting of sexual relationships between Andrews and coworkers.

29. The letter from Montgomery's counsel went further, outlining a statistical pattern of the Durham PD disciplining Black officers at a disproportionately higher rate. According to data cited in the document, while Blacks make up less than 21% of the police force, they comprise 41% of the pool of officers cited for discipline.

30. In addition, the November 25 letter recounted that fully 70% of black officers had been disciplined in comparison with only 25% of white officers being disciplined.

31. The Professional Standards division of the Durham PD proceeded with its parallel investigations of its senior leadership and in or around March 2025, made

8

a series of findings. Deputy Chief Bishop was sanctioned for "failing to provide adequate supervision" but received only verbal counseling. While Bishop's retirement had been in the works, she was permitted to retire at her full rank of Deputy Chief.

32. Assistant Chief Anthony was found to have violated several departmental conflict of interest policies but was permitted to resign.

33. As for Montgomery, the following findings were reached by the Professional Standards Division: (1) she was assigned a 40 day suspension for making an inquiry to an officer about his participation in the promotional matrix investigation; (2) her termination was recommended for improperly removing paper records of disciplinary actions from files in 2017 and for failing to report an allegation that Assistant Chief Anthony had accessed a confidential database; (3) for the alleged failure to notify the Chief of the promotional matrix complaint, Montgomery's demotion to Captain was recommended.

34. Chief Andrew, the ultimate decisionmaker, conducted her own de novo review of each finding and adopted a determination of termination regarding each finding in early April 2025.

35. At no point during the investigation or the subsequent administrative appeal was Montgomery given an explanation of how or why the inquiry expanded into years-old events beyond the original promotional matrix probe.

9

36. The decision to terminate Montgomery is hard to reconcile with the Department's more permissive approach toward the two white senior officers implicated in the original investigation: Assistant Chief Anthony, who was permitted to resign despite violating multiple departmental policies, an option not extended to Montgomery; or Deputy Chief Bishop, whose failure to properly scrutinize the adoption of a new skills matrix was only the basis for verbal counseling.

37. The harsher treatment of Montgomery, on the other hand, does align with the City's statistical propensity to discipline Black officers at a rate double their enrollment in the force and a departmental pattern of not disciplining white officers for major infractions: examples include a 2018 episode of white officers falsifying continuing education records without being terminated.

38. On April 16, 2025, Montgomery filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission

39. In May 2025, Montgomery then exercised her right to pursue an administrative grievance to the City Manager challenging the grounds of her termination.

40. In the course of her hearing, she presented evidence of a tape recording that conclusively contradicted Andrews' finding that Montgomery had failed to apprise her regarding an internal complaint regarding the promotional matrix.

10

41. The emergence of audio evidence debunking one of the grounds that the Chief cited for upholding Montgomery's termination reasonably undermines both Andrews' own credibility and calls into question her motive for sanctioning Montgomery.

42. In addition, Montgomery challenged the findings that she was derelict in failing to report Assistant Chief Anthony's log-in to a restricted internal affairs database, pointing out that another senior IA officer had asked Anthony to access the system to assist with a technical issue and that there was no indication that Anthony in any manner misused his access.

43. Montgomery also disputed that the over six years old removal of discipline records reflected individual negligence on her part: as she explained, the disciplinary files remained electronically stored and her actions reflected widespread confusion in the department about the requirements for physical preservation of certain personnel records.

44. In June 2025, a representative of the City Attorney's office informed Montgomery through her attorneys that the City was prepared to reverse Montgomery's termination and to permit her early retirement.

45. But the City's legal representative in further correspondence insisted on conditioning its decision to sustain Montgomery's appeal on Montgomery's waiver of her legal rights and her acceptance of a modest financial severance with

reduced benefits due to her early exit. Montgomery declined to surrender her right to pursue her legal claims for limited compensation.

46.     Approximately eight and a half months have passed and the City Manager has declined to resolve Montgomery's administrative challenge to her termination despite previously acknowledging that it had grounds to do so. Durham's inaction at this point reflects retaliation for Montgomery's decision to engage in protected activity.

47.     The City Manager possesses final policymaking authority regarding the resolution of personnel appeals and grievances, which provides a sufficient basis for her actions to confer municipal liability on the City of Durham.

## CAUSES OF ACTION

## COUNT I

**(retaliatory termination, in violation of Title VII, 42 U.S.C.A. § 2000e-3(A)**

48.     Plaintiff realleges and incorporates the factual allegations above as though fully set forth herein.

49.     Plaintiff Shari Montgomery has engaged in protected activity under Title VII in that she retained legal counsel for the purpose of challenging her placement on administrative leave and authorized the disclosure of her potential legal claims to the City of Durham.

50.     In the aftermath of Montgomery's decision to retain counsel and

12

threaten legal action, the City of Durham terminated her under suspicious circumstances: it relied on factual claims that were deficient to the point that the City at one point announced its intent to reverse the findings and it affirmed one allegation against Montgomery that the primary decisionmaker, the Chief of Police, knew was false.

51. The evidence of pretext in this case, combined with the evidence of more lenient treatment of other officers involved in the same misconduct probe, infers that Montgomery's protected activity was a determinative, but-for cause of her termination.

52. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered economic damages, including lost wages and benefits, compensatory damages, including emotional pain and suffering, embarrassment, and humiliation. Plaintiff is also entitled to recover attorney's fees and costs as permitted by law.

## **COUNT II**

### **(retaliation, in violation of 42 U.S.C. §§ 1981 and 1983)**

53. Plaintiff realleges and incorporates the factual allegations above as though fully set forth herein.

13

54. Plaintiff's retaliation claims under § 1981 are asserted through § 1983, which operates as the exclusive source of federal remedies for violations under color of state law of the rights guaranteed in § 1981.

55. Durham's continued failure to sustain Plaintiff's administrative grievance, or even to render a formal decision, reflects retaliation based on her refusal to waive her legal claims against the City.

56. Durham is liable under § 1981 for the retaliatory actions of the City Manager who exercises final decisionmaking authority over challenges by city employees to termination decision decisions by city entities.

57. As a result of Durham's unlawfully motivated conduct under §§ 1981 and 1983, Plaintiff has suffered economic damages, including lost wages and benefits, compensatory damages, including emotional pain and suffering, embarrassment, and humiliation. Plaintiff is also entitled to recover attorney's fees and costs as permitted by law.

## COUNT III

### (mixed motive discrimination, in violation of Title VII, 42 U.S.C. § 2000e-2(m))

58. Plaintiff realleges and incorporates the factual allegations above as though fully set forth herein.

59. Durham's statistically disproportionate exercise of its disciplinary authority to the detriment of Black police officers, and the more lenient treatment

14

extended to white senior officers involved in the same investigation as Plaintiff regarding promotional practices, infers that race was a motivating factor in Plaintiff's termination, even though other factors may have also motivated the termination.

60.     As a direct and proximate result of Durham's unlawfully motivated conduct under Title VII, Plaintiff has suffered economic damages, including lost wages and benefits, compensatory damages, including emotional pain and suffering, embarrassment, and humiliation. Plaintiff is also entitled to recover attorney's fees and costs as permitted by law.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

1. Permanent enjoying of Defendant from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

2. The award to Plaintiff of lost wages and benefits;

3. The award to Plaintiff of compensatory damages under §§ 1981 and 1983, and Title VII;

4. Attorney's fees and costs of this action;

15

5. Pre-judgment and post-judgment interest at the highest rate; and

6. Such other equitable relief as the Court may deem justified.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted this 6th day of March, 2026.


**HKM Employment Attorneys LLP**

*s/Taylor Adams*
Taylor Adams

N.C. Bar No. 50549
3623 Latrobe Drive
Unit 122
Charlotte, NC 28211
980-300-6630
taylor.adams@hkm.com


*s/Artur Davis*
Artur Davis[1]

(admitted in Alabama)
ASB-3672-D56A
2024 3rd Ave. North
Suite 212
Birmingham, AL 35203
205-881-0935
adavis@hkm.com

---

[1] Mr. Davis is licensed in the State of Alabama and will promptly file a notice of special appearance in this cause of action.

16